IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MARJORIE UHL, | ) | CASE NO. 1:20CV749 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JAMES R. KNEPP II |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Marjorie Uhl ("Uhl") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. 1383 (c). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

As set forth more fully below, the Administrative Law Judge erred when he assigned little weight to the opinion of Uhl's counselor, Ms. Mazzolini, because, in doing so, the ALJ ignored substantial evidence in the record indicating that Uhl's depression caused her to stop taking her medications. Accordingly, undersigned recommends that the Court **REVERSE** and **REMAND** the Commissioner's decision is for further proceedings consistent with this opinion.

**I. Procedural History**

Uhl protectively filed applications for DIB and SSI on October 5, 2016, alleging a disability onset date of July 2, 2016. Tr. 445, 654. She alleged disability based on the following: degenerative disc disease, diabetes, PTSD, migraines, anxiety, panic attacks, and heart

1

conditions. Tr. 687. After denials by the state agency initially (Tr. 541, 542) and on reconsideration (Tr. 569, 570), Uhl requested an administrative hearing. Tr. 602. A hearing was held before an Administrative Law Judge ("ALJ") on September 5, 2018. Tr. 468. In his January 31, 2019, decision (Tr. 445-456), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Uhl can perform, i.e., she is not disabled. Tr. 455-456. Uhl requested review of the ALJ's decision by the Appeals Council (Tr. 651) and, on March 13, 2020, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Uhl was born in 1972 and was 43 years old on the alleged disability onset date. Tr. 455. She previously worked as a customer service representative, desk clerk, and assistant retail manager. Tr. 489.

### B. Relevant Medical Evidence[1]

On October 21, 2015, Uhl saw licensed social worker Ms. Mazzolini, MA, at Humanistic Counseling Center for an initial assessment. Tr. 1605. She stated that she wanted help coping and that she has agoraphobia with panic disorder and chronic PTSD. She also had severe diabetes and other physical health problems. Upon exam, her dress, hygiene, and orientation were normal, her memory was intact, her mood was severely anxious, she had a blunted affect, her thought process and content were normal, her insight was good, her judgment, attention, and concentration were "good" and "fair," she had appropriate impulse control, slowed motor behavior, and normal speech. She was diagnosed with agoraphobia with PTSD, chronic and

---

[1] Because the undersigned recommends this case be remanded based on Uhl's mental health impairments and does not reach the question of whether Uhl has submitted new and material evidence requiring remand with respect to her physical impairments, only the evidence related to Uhl's mental impairments are summarized and discussed herein.

severe.

On April 20, 2016, Uhl saw a certified nurse practitioner at MetroHealth for a follow-up for her physical and mental impairments.  Tr. 1174-1175.  She reported that her depression and anxiety symptoms were increasing, she was having panic attacks, and she was taking Zoloft and Klonopin.

On May 30, 2016, Uhl went to the emergency room for a migraine headache that was triggered by a panic attack.  Tr. 892.  She had nausea and vomiting and was unable to keep her medication down.  She was treated and discharged.  Tr. 894.

On June 2, 2016, Uhl went to the emergency room for a headache with nausea and vomiting and a panic attack, as well as feeling lightheaded and dizzy.  Tr. 852.  Her blood work was abnormal, including a glucose level of 477, and she was diagnosed with diabetic ketoacidosis and admitted.  Tr. 854.  She was discharged on June 5.  Tr. 890.  On June 3, she had a psychiatric evaluation; upon exam, she was cooperative, had normal speech, an anxious mood with congruent affect, normal thought process, and somatic preoccupations.  Tr. 876.  Her medications were adjusted.  The day after her discharge, she returned to the emergency room for elevated glucose levels; she had not been able to get her new medication and she was using her old, short-acting medication.  Tr. 845-847.  She was treated and released.

On November 10, 2016, Uhl went to the emergency room due to chest pain and possible suicidal ideation.  Tr. 777-778.  She reported receiving support from a counselor whom she saw, but she had not been able to see a psychiatrist despite two attempts due to her fear of the waiting room.  Blood work showed a glucose level of 492 and she advised that she had been off her insulin frequently lately, and she was admitted.  She had a psychiatric assessment on November 11, at which she reported becoming increasingly depressed and anxious over the last couple of

months. Tr. 789. The prior Christmas she had been robbed at gunpoint three times and felt that she was having a harder time as that season approached this year. She felt sad, hopeless, helpless, and anxious, she had poor sleep and flashbacks, and ongoing suicidal ideations. She reported stopping her insulin medication 1.5 months prior because she "didn't care anymore" and had been having thoughts of overdosing on her insulin for the past three months. Her mental health medications had last been obtained in June. Tr. 790. Upon exam, she was alert, oriented, appeared disheveled, was preoccupied, and had poor eye contact, a depressed mood, a restricted and blunted affect, psychomotor retardation, slow and monotone speech, limited and concrete thought processes, suicidal ideation, and impaired insight and judgment. Tr. 792. She was discharged on November 16 "feeling good," tolerating her medications without side effects, and she denied suicidal ideation. Tr. 766. She was diagnosed with major depressive disorder, recurrent, severe; panic disorder with agoraphobia; and PTSD. Tr. 766

On December 5, 2016, Uhl underwent a psychiatric evaluation at Centers for Family and Children with Nurse Practitioner Ms. Kauffman. Tr. 1295, 1300. She stated that she needed to get her medication under control and reported depression, anxiety and panic. Her depression and anxiety caused her to sleep too much or too little. Triggers for her panic were loud noises, lots of people, and being outside of her house with new places or new people. Kauffman stated that she presented with symptoms of depression and anxiety, she reported episodes of psychomotor agitation with concurrent depression, and it was suspected that this was related to anxiety. Tr. 1297. Kauffman diagnosed with major depressive disorder, PTSD and panic disorder with agoraphobia.

On January 9, 2017, Uhl called her doctor's office and was noted to have been very anxious about a recent fatty liver diagnosis. Tr. 1349. She wanted to be seen sooner than

4

scheduled but she was not willing to come to the main campus of the facility due to agoraphobia. Tr. 1349.

On January 19, 2017, Ms. Szep from the Centers for Family and Children completed an activities of daily living questionnaire on behalf of Uhl. Tr. 1291-1292. Szep stated that Uhl has high anxiety whenever she leaves the house and takes anti-anxiety medication whenever doing so. She reported that Uhl had become friendly with security guards at certain grocery stores to assist her with her anxiety while shopping. She stated that Uhl was "medicated with no issues" and that she attended art therapy.

On March 15, 2017, Uhl saw Nurse Kauffman at the Centers for Families and Children. Tr. 1301. She had not been to a counseling session for a few weeks because she had been ill. She had been grumpy due to being sick and she denied major mood swings. Her anxiety had increased after her wallet was stolen. She reported that she was now able to attend art therapy without taking her medication, hydroxyzine. Tr.1301.

On May 31, 2017, Uhl saw Nurse Petitt at the Centers for Family and Children for a medication management appointment. Tr. 1303. Uhl stated that she was "doing quite well" since her medication was changed: "I feel so much better I am more level things are good." She had been sleeping well and was keeping busy with her day-to-day chores in addition to water aerobics classes at the YMCA.

On August 18, 2017, Uhl saw Nurse Kauffman. Tr. 1625-1627. She reported stress at home due to more fighting in her household, and, as a result, she had been using Vistaril more over the last 1.5 to 2 months. She had had a panic attack about two weeks prior; otherwise, Vistaril has been stopping her panic attacks. She reported wanting to isolate more and was sleeping more than she needed: "Some of that is muscle relaxers and some of it is how I cope."

Kauffman increased her Abilify for depression.

On September 27, 2017, Uhl saw Nurse Kauffman. Tr. 1622. She reported that she had stopped taking her medication for about a week and had been back on them for about a week. She explained, "part of it is the diabetes and I get tired of taking shots and I get depressed." She also procrastinates on refilling her pillbox and she was interested in the pillminder program offered by the counseling facility. At the time, she rated her depression as 4/10 and her anxiety as 0/10. Tr. 1623. She was getting panic attacks every other day and had been taking Vistaril, which helped relieve her symptoms. Her medications were adjusted to accommodate a liver impairment she had acquired. Tr. 1624.

On October 26, 2017, Uhl returned to Nurse Kauffman. Tr. 1619. Her depression was "holding steady" and the pillminder program had improved her medication adherence.

On November 21, 2017, Uhl saw certified nurse practitioner Mr. Brager at the Centers for Family and Children. Tr. 1616. She reported that she was able to leave her house but that it was hard. Her anxiety was higher as the holidays approached. She felt that her medication was helping. Brager assessed her as making minimal progress to goals and objectives. Tr. 1617.

On December 21, 2017, Uhl saw Nurse Brager for a follow up. Tr. 1613. Uhl advised that she was doing fairly well with the holiday coming up. She rated her depression as 5/10 and stated that it had been closer to 8/10 when she had had a cold and not eating well, causing her blood sugars to worsen. Brager assessed her as making "some" progress.

On February 15, 2018, Uhl saw Nurse Brager for a follow up. Tr. 1610. Uhl reported increased stress due to financial problems and a person she lived with using drugs again. Her increased stress caused her to sleep excessively and have nightmares. Tr. 1611. Her pillminders helped her take her medication. Tr. 1643.

6

On May 1, 2018, Uhl saw her doctor for a follow up and reported that she had stopped taking her diabetes medication due to depression, but that she was back on those medications. Tr. 1525. The impression was uncontrolled diabetes, non-compliant for 2-3 months, and her depression was listed as stable. Tr. 1529. On May 10, Uhl visited the Centers for Family and Children for help with her pillminders. Tr. 1633. She was observed to be disheveled with a flat affect and she reported depression, some anxiety, and sleeping a lot.

On June 1, 2018, Uhl returned to Nurse Brager for a follow up. Tr. 1607. She reported that she continued to struggle with ongoing depression and anxiety and had been so depressed that she was off all her medications for three months. She had been back on her medications for a month. She stated that she struggled to get up sometimes, to take her medication, or to go to doctor appointments and she had been canceling them. She had thoughts that she didn't care whether she lived or died, although was not actively suicidal. Her appetite was poor, her sleep was interrupted, and she was not using her sleep apnea machine. Tr. 1608. She was assessed as making some progress and her medications were adjusted (Zoloft increased, Abilify and Trazodone continued).

**C. Opinion Evidence**

    **1. Treating source**

On February 9, 2017, Ms. Mazzolini, MA, from the Humanistic Counseling Center, completed a daily activities questionnaire on Uhl's behalf. Tr. 1293-1294. Mazzolini stated that she first saw Uhl in October 2015. She commented that Uhl had anxiety due to past trauma at work: she was robbed three times, twice with a gun, at her prior job as assistant manager at a gas station. Due to her PTSD, she has poor stress tolerance, and she has a high need for rest due to multiple health problems. She is able to drive, though she is cautious and fearful. She is

compliant with treatment and had recently been hospitalized due to severe depression and anxiety.

On August 8, 2018, Mazzolini examined Uhl and drafted a letter on her behalf. Tr. 1594. During the exam, she observed that Uhl had normal hygiene. She indicated that Uhl had a blunted, lethargic, and appropriate mood and affect on some days, an inappropriate, stunted, and lethargic mood and affect on other days, appropriate impulse control, slowed motor behavior, quiet speech, good insight, fair judgment, attention, and concentration, and appropriate and logical thought processes. She had had recent suicidal ideation, but none at that visit, and she was assessed as having a low risk for suicide. Mazzolini diagnosed major depression, severe; PTSD; and agoraphobia with panic disorder, and opined that, in her opinion, Uhl could not work.

In her letter, Mazzolini stated that Uhl has struggled with severe chronic major depression and PTSD since she first met with her, and that she also has panic disorder and agoraphobia stemming from being robbed three times during her last work at a service station. Tr. 1592-1593. Mazzolini commented that, earlier in 2018, Uhl became so paralyzed from her severe depression and anxiety that she dropped out of treatment for a few months and stopped taking all of her medications, including her insulin. At the time of writing, Uhl was back in counseling on a weekly basis and back on all her medications; however, she was still chronically depressed and anxious. Mazzolini opined that Uhl cannot handle even a part-time job due to her poor coping skills, level of depression, flat affect, anxiety, fatigue, low self-esteem, and inability to handle stress.

### 2. State Agency Reviewing Physicians

On March 20, 2017, Dr. Tishler, Ph.D., opined that there was insufficient evidence upon which to determine how Uhl was functioning. Tr. 525-526. On July 28, 2017, state agency

psychologist Dr. Tangeman, Ph.D., adopted the following mental RFC finding that an ALJ had assessed in a prior decision from July 2016: Uhl can tolerate frequent interaction with supervisors, occasional interaction with coworkers and members of the general public, she can relate to others on a superficial basis, excluding performing conflict resolution, she can tolerate a relatively static work environment, meaning one with no more than occasional changes and with such changes being explained in advance, and she can tolerate a work environment that does not include strict production requirements or a fast pace. Tr. 552.

### D. Testimonial Evidence

#### 1. Uhl's Testimony

Uhl was represented by counsel and testified at the administrative hearing. She testified that she lives in a house with her boyfriend; they live in the basement and her boyfriend's brother, his girlfriend, and her child live upstairs. Tr. 483.

When asked why she had stopped working in 2014, Uhl responded that she was fired due to missing at least one day a week due to physical and mental issues and that she was having panic attacks at work. Tr. 475. She had been consistently getting treatment for her anxiety and panic attacks, aside from a gap in which she stopped taking all her medications due to severe depression. Tr. 474-475. She sees a counselor every other week, and, if she needs to, every week. Tr. 475. She sees a psychiatrist to get her medications; they are still adjusting them to treat her depression. Tr. 475-476. Currently, they were considering a medication in the form of a shot once a month because she forgets to take her medications. Tr. 476.

Uhl testified that she has panic attacks 4-5 times a week. Tr. 476. They are triggered by loud noises or having to leave the house, even to go grocery shopping, and she has to take medication to deal with them. Tr. 476. She explained that she takes her medication when she

9

has a panic attack or, if she knows she's leaving the house, she takes her medication in advance. Tr. 476. She had a panic attack the morning of the hearing. Tr. 476. To calm herself, she took an extra pill, which her psychiatrist had told her she could do, and she brought her parents with her, as they always have a calming effect on her. Tr. 477. On days when she has to leave the house she gives herself a little pep talk. Tr. 477. She'll take her medication, and sometimes she will meditate. Tr. 477. She always has someone with her; her parents, her boyfriend, her boyfriend's sister. Tr. 477, 488. The last time she left the house by herself was when she drove herself to the emergency room the week prior to the hearing; no one could accompany her at that time. Tr. 477. She doesn't usually have panic attacks when she drives, but if she feels one coming on she pulls over. Tr. 477. She drives alone to places that she considers safe areas, such as her parents' house and to see her psychiatrist. Tr. 478. Still, she takes her medication before she leaves. Tr. 478.

Uhl stated that she also goes to art therapy. Tr. 479. She used to go once a week but lately she has been going twice a month because she talks herself out of it. Tr. 479. At home, she will do some coloring and play games on her computer for a short time, but she can't do crafts like she used to because of her carpal tunnel. Tr. 479. Aside from her family and friends previously mentioned, she does not see others on a regular basis. Tr. 479. She is unable to be around crowds and has panic attacks; she starts crying uncontrollably and wants to run and hide. Tr. 480. She doesn't like long lines at the grocery store. T. 480. The last time she experienced being in a crowd was at a family gathering and she had to leave. Tr. 480. There were too many people and too many kids running around, it was too loud, and it was as if she had sensory overload. Tr. 480.

When asked if she had memory problems other than forgetting to take her medications,

10

Uhl responded that she did not really notice any problems with her memory. Tr. 480. She does have problems with concentration and focus; for instance, she becomes distracted too easily or focuses on one thing too much. Tr. 480. And, if she reads a book, she doesn't retain what she read. Tr. 481. She constantly has nightmares; they started when she was robbed. Tr. 481. Her other symptoms include sleeping a lot, being easily spooked, and having sensory overload. Tr. 481.

When asked about her hospitalization in 2016, Uhl explained that she was suicidal. Tr. 484. She stated that she was "probably just a little worse than this recent one where I came off my medications. I had come off my medications and I was just tired of being in pain, I was tired of hurting all the time, being scared all the time." Tr. 484. She takes Zoloft for depression, Atarax for anxiety, and Abilify. Tr. 484, 485. They are planning on increasing the Abilify dose to a shot she gets every month; "that way I don't have the option of not taking it because it goes for a whole month." Tr. 485. She continued, "So we're hoping that that way I don't get into the depression nor I quit taking my medicines." Tr. 485. She listed all the medications she takes, including her diabetes medication. Tr. 485. When asked if her medications help her, she responded that they can't seem to get her blood sugar under control, that they are constantly having to adjust her medications for depression, and also that her diabetes has been better lately. Tr. 485-486.

### 3. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing. The ALJ discussed with the VE Uhl's past work. Tr. 489. The ALJ asked the VE to determine whether a hypothetical individual with Uhl's work experience could perform work if that person had the limitations subsequently assessed in the ALJ's RFC determination, described below. The VE answered that such an

11

individual could perform the following jobs with significant numbers in the national economy: lens inserter, surveillance system monitor, and optical assembler. Tr. 482-493, 495.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his January 31, 2019, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2018. Tr. 448.

2. The claimant has not engaged in substantial gainful activity since July 2, 2016, the alleged onset date. Tr. 448.

3. The claimant has the following severe impairments: degenerative disc disease of the cervical and lumbar spine, obesity, chronic pain syndrome, bilateral carpal tunnel syndrome, history of left frozen shoulder, history of pulmonary emboli, obstructive sleep apnea, diabetes mellitus with peripheral neuropathy of the bilateral upper and lower extremities, migraines, anxiety, post-traumatic stress disorder, agoraphobia with panic disorder, and depression. Tr. 448.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 448.

5. The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except with the following additional limitations. She can stand or walk for up to 30 minutes at one time. She can perform frequent pushing and/or pulling

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

      with the lower extremities.  She can operate foot controls on a frequent basis.  She can perform frequent handling, fingering, and feeling bilaterally.  She cannot perform overhead reaching with the left upper extremity but she can frequently perform reaching in other directions with the left upper extremity.   She can occasionally climb ramps and stairs and can occasionally balance, stoop, kneel, and crouch.  She cannot climb ladders, ropes, or scaffolds, nor can she crawl.  She must avoid hazards such as unprotected heights and moving mechanical machinery.  She cannot perform commercial driving.  The claimant can tolerate occasional exposure to slippery, uneven, or vibrating surfaces.  She can tolerate frequent interaction with supervisors as well as occasional interaction with coworkers and members of the general public, but she can relate with others on a superficial basis, which would specifically exclude performing conflict resolution.  She can tolerate a relatively stable work environment, meaning one with no more than occasional change[s] and with such changes being explained in advance.  She can tolerate a work environment that does not include strict production requirements or fast pace.  She requires a cane for ambulating.  Tr. 451.

6. The claimant is unable to perform any past relevant work.  Tr. 454.

7. The claimant was born in 1972 and was 43 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.  The claimant subsequently changed age category to a younger individual age 45-49.  Tr. 455.

8. The claimant has at least a high school education and is able to communicate in English.  Tr. 455.

9. Transferability of job skills is not material to a determination of disability because using the Medical-Vocational rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills.  Tr. 445.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 445.

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 2, 2016, through the date of this decision.  Tr. 456.

### V. Plaintiff's Arguments

Uhl argues that the ALJ erred when he evaluated the opinion evidence and that new and

14

material evidence warrants remand. Doc. 17.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

Uhl argues that the ALJ erred when assigning "little" weight to the opinion of her licensed social worker, Ms. Mazzolini. Doc. 17, p. 19. She contends that the ALJ erred because he remarked that Uhl was not as limited as Mazzolini opined when Uhl was compliant with treatment and medications, but the ALJ failed to account for the evidence in the record showing that Uhl's depression caused her to stop taking her medications. Doc. 17, pp. 19-20.

As an initial matter, Mazzolini, a licensed social worker, is not an "acceptable medical source." *See Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 838, n.9 (6th Cir. 2016) ("According to Social Security Ruling 06–03p, [] a licensed clinical social worker is not an acceptable medical source") (internal quotation marks omitted). However, an ALJ still must explain the weight given to "other sources" such as licensed social workers. *See* SSR 06-03P, 2006 WL 2329939, at *6 ("…the adjudicator generally should explain the weight given to opinions from

… "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.").

The ALJ considered Mazzolini's opinion as follows,

> The claimant's counselor from Humanistic Counseling Center prepared letters in which she noted that the claimant was incapable of even part-time work due to her mental impairments and unable to work. Little weight is directed to these determinations as they are inconsistent with the claimant's response to mental health treatment. The overall records show[] that when the claimant is compliant with treatment and medications, she functions much better than described by the counselor. Further, findings of disability are reserved for the Commissioner under 20 CFR 404.1527 and 416.927.

Tr. 454 (record citation omitted).

In order to be entitled to benefits, a claimant must follow treatment prescribed by her medical sources if this treatment is expected to restore the claimant's ability to work. 20 C.F.R. § 404.1530(a). However, "[f]or some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009) (citing *Pate–Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (collecting cases recognizing that a mentally ill person's noncompliance with treatment "can be ... the result of the mental impairment itself and, therefore, neither willful nor without a justifiable excuse")). In *White*, the Sixth Circuit found that there was no evidence in the record indicating why the claimant failed to seek treatment during a six-month period, and that it was reasonable for the ALJ to infer that the lack of treatment during that time indicated an alleviation of the claimant's symptoms. *Id*. at 284. Here, in contrast, the record clearly shows that Uhl has severe depression; medical records document that she stopped taking her medications on three occasions because of depression (Tr. 749, 1525, 1622); and that the cessation of all her medications caused worsening symptoms, including a hospitalization for suicidal ideation and alarmingly abnormal blood

16

readings effecting her severe diabetes (Tr. 749). The ALJ acknowledged that evidence (Tr. 453-454) but did not explain how it factored into his assessment of Mazzolini's opinion or his conclusion that Uhl is not disabled. The ALJ's failure to address that issue warrants remand.

Defendant argues that the ALJ offered proper reasons for discounting Mazzolini's opinion, commenting that the ALJ "noted that when Plaintiff was compliant with treatment and medications, she functioned much better than described by Ms. Mazzolini." Doc. 20, p. 10. Assuming, arguendo, that Defendant's statement is true, it fails to account for the fact that Uhl sometimes go off her medication due to her depression. Thus, how she functions when taking her medications does not address how she functions when she stops taking her medications. The ALJ does not discuss anywhere in his decision Uhl's ability to function when she is off her medications. Defendant also submits that the ALJ, elsewhere in his decision, observed that Uhl had reported increased depression in May and June 2018, "but pointed out that she was off her medications for months." Doc. 20, p. 10 (citing 453-454). Again, Defendant's assertion misses the mark. The point is that the ALJ, despite acknowledging that Uhl gets severely depressed and stops taking her medication, did not explain how that factored into his analysis.

In *Burge v. Comm'r of Soc. Sec.*, No. 1:13 CV 87, 2013 WL 6837192, at *3 (N.D. Ohio Dec. 26, 2013), the court reversed the ALJ's decision for failing to discuss or make any findings regarding the claimant's treatment non-compliance. After discussing case law, including *White*, *supra*, the court stated, "to establish a severe mental impairment as an acceptable reason excusing a claimant's adherence to a medical regimen including prescription psychiatric medications, the record must contain evidence expressly linking noncompliance with the severe mental impairment….The requisite evidence of that link will preferably appear in an opinion or assessment by a medical source." Because the evidence of record in this case shows that Uhl has

17

a severe mental impairment (depression) linked to an acceptable reason (apathy, suicidal ideation) explaining her adherence to a treatment regimen including prescription psychiatric medications and an opinion linking her noncompliance with the severe mental impairment (Mazzolini's opinion), the ALJ's failure to make a finding regarding the impact of that evidence is reversible error. *Id*.

Finally, Defendant argues that the ALJ reasonably discounted Mazzolini's opinion regarding Uhl's inability to work. Doc. 20, p. 11 (citing 20 C.F.R. § 404.1527(d) (An opinion that someone is disabled or cannot work is not a medical opinion but an opinion on an issue reserved to the Commissioner); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007) ("the conclusion of disability is reserved to the Secretary")). While true that the ALJ could properly discount Mazzolini's opinion that Uhl could not perform work, that does not mean that the ALJ was permitted to set aside Mazzolini's entire opinion regarding Uhl's impairments and symptoms, particularly her statement that Uhl had previously become so paralyzed by depression and anxiety that she dropped out of treatment for a few months and stopped taking her insulin and mental health medications. Tr. 1593.

Because the undersigned recommends remand due to the ALJ's error described above, the undersigned does not consider Uhl's additional argument that new and material evidence regarding her physical impairments requires remand. On remand, the ALJ will have an opportunity to consider that evidence.

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **REVERSED and REMANDED** for proceedings consistent with this opinion.[3]

Dated: May 14, 2021

/s/Kathleen B. Burke
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[3] This opinion should not be construed as a recommendation that, on remand, Uhl be found disabled.